# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Ronald A. Guzman | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 00 C 2465 | **DATE** | 3/28/2003 |
| **CASE TITLE** | ABHA RAWAT vs. METROPOLITAN LIFE INSURANCE CO. | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m)  ☐ Local Rule 41.1  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).

(10) ■ [Other docket entry]  For the reasons provided in this Memorandum Opinion and Order, the Court grants defendant's mtoion for partial summary judgment [42-1, 43-1]. Only Rawat's national origin discrimination claim based on her termination remains for trial. ENTER MEMORANDUM OPINION AND ORDER. Final pretrial order to be filed in open court on 5/14/03 at 10:00 a.m.

(11) ■ [For further detail see order attached to the original minute order.]

| | | |
|---|---|---|
| | No notices required, advised in open court. | |
| | No notices required. | |
| | Notices mailed by judge's staff. | |
| | Notified counsel by telephone. | |
| ✓ | Docketing to mail notices. | |
| | Mail AO 450 form. | |
| | Copy to judge/magistrate judge. | |
| CG | courtroom deputy's initials | |

number of notices

APR 01 2003

date docketed

U.S. DISTRICT COURT
CLERK
03 APR -1 AM 9: 16
FILED FOR 10

Date/time received in central Clerk's Office

docketing deputy initials

date mailed notice

mailing deputy initials

**Document Number**

64

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| ABHA RAWAT, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 00 C 2465 |
| | ) | |
| METROPOLITAN LIFE | ) | Judge Ronald A. Guzmán |
| INSURANCE CO., | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

This is a Title VII action by Abha Rawat against her former employer Metropolitan Life Insurance Company alleging employment discrimination based on national origin as well as retaliation. Defendant seeks summary judgment as to all of plaintiff's claims except the discrimination claim based on her termination. For the reasons stated below, the Court grants defendant's motion for partial summary judgment.

**DOCKETED**
APR 0 1 2003

## FACTS

The following facts are undisputed. Plaintiff is a native of India. (Def.'s LR 56.1(a)(3) ¶1.) She began working for defendant in 1991 and was terminated on February 12, 1999. (Def.'s Ex. F; Def.'s LR 56.1(a)(3) ¶ 12.) Plaintiff began her employment in the defendant's Hinsdale, Illinois office as a QBC clerk.[1] (Def.'s LR 56.1(a)(3) ¶ 1.) Branch administrator Lynn Roach and branch manager Roshan Goel managed the Hinsdale office at this time. (Pl.'s Ex. 11i.) On

---

[1] The parties do not define the duties of a QBC clerk, and it is unclear from the record what plaintiff's job responsibilities were.

August 23, 1995, while still working at the Hinsdale office, plaintiff complained internally to the company's regional vice president Kim Taylor regarding an incident with Goel. (*See* Def.'s LR 56.1(a)(3) ¶ 2; Pl.'s Ex. 1; Def.'s Ex. D.) Plaintiff's internal complaint stated that Goel commonly treated her in an abusive manner, which affected her "mental peace and health," and requested a transfer to another office. (Def.'s Ex. D.)

Plaintiff, however, was not transferred until 1996, when Taylor moved her to the defendant's Elmhurst office. (Def.'s LR 56.1(a)(3) ¶ 3.) Branch administrator Juanita Babcock and branch manager Jack Cholakian managed the Elmhurst office. (Pl.'s Ex. 11.)

On October 23, 1996, Lynda Einspar, a QBC clerk at the Hinsdale office, filed a sexual harassment complaint against Goel with the Illinois Department of Human Rights ("IDHR"). (Def.'s Ex. G.) On May 28, 1997, defendant's attorney asked plaintiff to sign a prepared affidavit for use in connection with the *Einspar* case. (Def.'s Exs. E & F.) The affidavit, as prepared by defendant's attorney, characterized Goel as a "dictator," stating that he yelled and screamed at employees in an inappropriate manner and opened employees' office mail. (Def.'s Ex. F.) The affidavit stated plaintiff witnessed Goel yelling at a former employee, Mr. Raja Rajagopalan. (*Id.*)

Before signing the affidavit, plaintiff added a handwritten paragraph stating that Goel threatened her and discriminated against her which affected her mental health and peace. (Def.'s Ex. F.) Defendant presented the amended affidavit to the IDHR along with affidavits from several other employees who had worked with Goel at the Hinsdale office. (Def.'s Ex. G.) However, it appears that plaintiff's statement was the only one that reflected negatively on Goel. (Def.'s Ex. G.)

2

The IDHR dismissed Einspar's claims on September 3, 1997 concluding that she failed to establish a *prima facie* case for sexual harassment because the evidence showed that Goel yelled at and opened the mail of both male and female employees. (Id.) Thereafter, the Equal Employment Opportunity Commission issued Einspar a right-to-sue notice and on February 28, 1998, defendant settled Einspar's claim. (Def.'s Ex. H; Pl.'s LR 56.1(b)(3)(B) ¶ 14.) On April 9, 1998, Babcock and Cholakian rated plaintiff's 1997 performance "generally effective." (Def.'s Ex. Z.)

In mid-October 1998, defendant announced plans to close the Elmhurst office and merge it with defendant's Downers Grove office. (Def.'s App., Taylor Dep., at 110.) Although the Elmhurst office was not officially closed until January 18, 1999, office management immediately began downsizing its staff. (Def.'s Ex. L.) Plaintiff, along with two other QBC clerks, were among the employees management immediately transferred from the Elmhurst office. (Def.'s App., O'Malley Aff. ¶¶ 3-5.) The Downers Grove office, however, was not yet prepared to absorb the influx of Elmhurst employees, and as a result, plaintiff was temporarily reassigned to the O'Hare office, where she served in a lateral position. (*Id.*; Def.'s LR 56.1(a)(3) ¶ 21.) Although she worked from the O'Hare office, plaintiff was paid from the Downers Grove payroll. (Def.'s LR 56.1(a)(3) ¶ 7.)

As a result of the merger, Downers Grove had eleven QBC clerks on its payroll. (Def.'s Ex. L.) After assessing its staffing needs, Downers Grove branch manager Mike O'Malley and branch administrator Pamela Szekely concluded the office did not need eleven clerks and thereafter instituted an evaluation process to determine which of the eleven clerks to retain at the

Downers Grove location.[2]  (Def.'s Ex. L.)  At the same time, O'Hare branch manager Raja

Banerji told plaintiff that O'Hare needed a permanent full-time QBC clerk and that he was

interested in taking her on full-time.  (Def.'s App., Rawat Dep., at 457.)  Evidently, Banerji

communicated this to Rich Reilly, the company's regional administrator.  (Def.'s Ex. M.)

As part of the evaluation process, management rated each of the eleven clerk's 1998

performance from 1 to 5, with 1 being the lowest and 5 the highest.  (Pl.'s Ex. 11v.)  Based on

these evaluations, O'Malley and Szekely recommended to Taylor which of the eleven to retain at

Downers Grove, and which of the eleven to declare as excess.  (Def.'s Ex. M.)  It is unclear from

the record whether Taylor or O'Malley and Szekely ultimately decided which of the clerks to

keep and which to excess.

Plaintiff was the only clerk of the eleven that was from India.  (Pl.'s LR 56(b)(3)(B) ¶¶

24, 25.)  Likewise, plaintiff was the only clerk of the eleven who filed an internal harassment

complaint during her employment or who took part in the *Einspar* case.  (*Id.* ¶¶ 26, 27.)  On

January 26, 1999, Babcock, plaintiff's Elmhurst supervisor, assessed plaintiff's 1998

performance as a 3.  (Pl.'s Ex. 11v.; Def.'s Ex. M.)  However, at O'Malley and Szekely's

request, she later reduced that assessment to a 2.  (Pl.'s App., Babcock Dep., at 61-64; Def's Ex.

M.)

On February 3, 1999, relying on their 1998 performance evaluations, O'Malley and

Szekely recommended that defendant not retain plaintiff and three other clerks at the Downers

Grove office.  (Def.'s Ex. L.)  Among the other three clerks not retained at the Downers Grove

---

[2]It is unclear from the record how many QBC clerks the office needed.  The record only
indicates that there was an excess of clerks.

office was Denise Kasper, who like Plaintiff, had her performance evaluation reduced by O'Malley and Szekely from a 3 to a 2. (*Id.*) At this time, O'Malley and Szekely were not aware that plaintiff made the 1995 internal complaint or that she signed the affidavit in the *Einspar* case. (Def.'s LR 56.1(a)(3) ¶ 14.)

On February 4, 1999, Reilly stated that he and Taylor were prepared to adopt O'Malley and Szekely's recommendation not to retain plaintiff at the Downers Grove office. (Def.'s Ex. M.) Reilly also stated that he and Taylor were prepared to offer plaintiff a full-time position at the O'Hare office, apparently believing the O'Hare office still needed clerical help. (*Id.*) However, Banerji, who had expressed interest in hiring plaintiff, was demoted and replaced as O'Hare branch manager on January 1, 1999 by Subhash Katial. (Def.'s App., Katial Dep., at 5-7, 45.) Katial decided against hiring any full-time QBC clerks at O'Hare until he had more time to assess the office's staffing needs. (*Id.* at 5-7, 45.)

When plaintiff's employment at Downers Grove officially terminated on February 12, 1999, Katial still had not decided to hire any full time clerks, and as a result plaintiff was not offered a position at O'Hare. (Def.'s LR 56.1(a)(3) ¶ 12.) On February 19, 1999, plaintiff received a letter from the defendant explaining her termination, citing changing business conditions. At this time Katial was unaware that plaintiff made the 1995 internal complaint or that she signed the affidavit in the *Einspar* case. (*Id.* ¶ 11.) Ultimately, Katial hired a part-time QBC clerk instead of a full-time clerk, and this clerk was from India. (*Id.* ¶ 13.) Between October 1998 and May 1999, neither the Downers Grove office nor the Hinsdale office hired any QBC clerks. (*Id.* ¶¶ 17, 18.)

During the last two weeks of her employment, plaintiff incurred $126.40 in traveling

expenses. (*Id.* ¶ 24.) There was a two to three-month delay in paying plaintiff for these expenses due to an internal company dispute about whether the Downers Grove office or the O'Hare office should reimburse plaintiff. (*Id.*) Plaintiff was ultimately reimbursed in April 1999, despite a company policy not to reimburse clerks for travel expenses. (*Id.* ¶¶ 25, 26.) Plaintiff was the only clerk who was reimbursed for her travel expenses from October 1998 to February 1999, even though other clerks were required to travel to other offices. (*Id.* ¶ 25.)

Plaintiff filed her complaint on June 28, 2000 alleging violations of Title VII of the Civil Rights Act of 1964. Plaintiff alleged she suffered several adverse employment actions based on her national origin and in retaliation for her 1995 internal complaint, and for signing the affidavit in 1997. The alleged adverse actions include: (1) plaintiff's reassignment from the Elmhurst office to the O'Hare office after the merger; (2) plaintiff's reduced 1998 performance evaluation; (3) defendant's delay in paying plaintiff's travel expenses; (4) plaintiff's termination on February 12, 1999; and (5) defendant's failure to hire plaintiff full-time at the O'Hare office.[3]

## DISCUSSION

Summary judgment is appropriate when the moving party's evidence establishes that there is no genuine issue of material fact and that the moving party is entitled to judgment as a

_____

[3]Initially, plaintiff asserted the following additional adverse actions: (1) defendant's January 26, 1996 voluntary separation offer; (2) plaintiff's 1995 annual performance rating reduction that occurred on March 23, 1996; (3) plaintiff's transfer from the Hinsdale office to the Elmhurst office in August of 1996; and (4) plaintiff's 1997 annual review of generally effective, which she portrayed as unusually low. However, pursuant to a joint motion between the parties to clarify the summary judgment record filed June 18, 2002, plaintiff stipulates that she "is only asserting Title VII claims regarding employment actions that occurred on or after October 1, 1998." (Joint Mot. Clarify Summ. J. Record ¶ 2.)

matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *King v. Nat'l Human Resource Comm., Inc.*, 218 F.3d 719, 723 (7th Cir. 2000). A court considering a motion for summary judgment must draw all inferences from the record in the light most favorable to the non-moving party. *Bay v. Cassens Transp. Co.*, 212 F.3d 969, 972 (7th Cir. 2000). The moving party is not entitled to summary judgment when a reasonable jury could return a verdict in favor of the non-moving party based on the evidence in the record. *Insolia v. Phillip Morris, Inc.*, 216 F.3d 596, 599 (7th Cir. 2000).

## I. Adverse Employment Actions

Title VII prohibits, among other things, an employer from discriminating against its employees on the basis of national origin or retaliating against its employees for opposing unlawful employer practices. *See* 42 U.S.C. § 2000e-2(a); *id.* § 2000e-3(a)(1994). It has long been established that in order to make out a *prima facie* case of national origin discrimination or retaliation under Title VII, the plaintiff must allege that she suffered an adverse employment action at the hands of her employer because of her national origin or because she opposed an unlawful employer practice. *See Stone v. City of Indianapolis Pub. Utils. Div.*, 281 F.3d 640, 644 (7th Cir. 2002) (stating plaintiff in a retaliation claim under Title VII must allege adverse employment action); *Veprinsky v. Fluor Daniel, Inc.* , 87 F.3d 881, 891-92 (7th Cir. 1996) (stating plaintiff in national origin discrimination case must allege he suffered an adverse employment action).

While Title VII does not specifically define "adverse employment action," the statute lists as examples failure or refusal to hire, discharge, and limitation, segregation or classification of an

employee in a way that deprives the employee of employment opportunities or "otherwise adversely affect[s] his status as an employee." 42 U.S.C. § 2000e-2(a)(1)-(2). This list is not exhaustive as the Seventh Circuit has interpreted the term "adverse employment action" quite broadly. *Smart v. Ball State Univ.*, 89 F.3d 437, 441 (7th Cir. 1996). An employee that has been fired, demoted or received a reduction in pay or benefits has without question suffered an adverse employment action. *Id.* Adverse employment actions are not limited to monetary losses and include loss of job prestige as well as a "dramatic downward shift in skill level required to perform job responsibilities." *See Dahm v. Flynn,* 60 F.3d 253 (7th Cir. 1994) (holding a significant reduction in job responsibilities can serve as an adverse employment action); *Collins v. State of Ill.*, 830 F.2d 692, 703 (7th Cir. 1987) (holding an employee who lost job title, office, telephone, business cards and listing in professional directories suffered an adverse employment action).

In any case, however, "common sense and the examples used in the [statute] . . . exclude instances of different treatment that have little or no effect on an employee's job." *Sweeney v. West,* 149 F.3d 550, 556 (7th Cir. 1998). Indeed, the plaintiff in a Title VII action must allege an employment action that negatively effected the plaintiff's employment "in a tangible way," with respect to the employee's "compensation, terms, conditions, or privileges of employment." *See id.* at 554 (stating employer action without tangible adverse job consequences is not an adverse employment action); *see also Fyfe v. City of Fort Wayne*, 241 F.3d 597, 602 (2001) (holding that "not every unwelcome employment action qualifies as an adverse action."); *Crady v. Liberty Nat'l Bank & Trust Co.*, 993 F.2d 132, 136 (7th Cir. 1993) (holding that an adverse employment action "must be more disruptive than a mere inconvenience or an alteration of job

responsibilities.").

Plaintiff in this case has alleged defendant subjected her to several adverse employment actions because of either her national origin or protected activity. However, most of these allegations fail to qualify as adverse employment actions and therefore fall by the wayside. The Court considers each in turn.

### A. O'Hare Reassignment

Plaintiff alleges that her reassignment to defendant's O'Hare office in October 1998 after defendant announced the merger of the Elmhurst and Downers Grove offices was an adverse employment action. Plaintiff has failed to explain the basis for her allegation. However, it appears from the record that plaintiff's doctor was located only five minutes from the Elmhurst office and she would visit her doctor for physical therapy on her lunch hour. (Def.'s App., Rawat Dep., at 222-23.) However, after her transfer to O'Hare, she was unable to continue her lunchtime therapy. (*Id.*, at 220.)

Defendant concedes that the O'Hare office was further from plaintiff's doctor's office than either the Downers Grove or Elmhurst offices. However, defendant argues that plaintiff stated no preference between the Downers Grove office and the O'Hare office, and that she later requested a permanent transfer to the O'Hare location. Further it is undisputed that the transfer was to a lateral position and that plaintiff performed the same job at the same pay at O'Hare. Defendant contends that the mere fact that Downers Grove would have been more convenient for plaintiff is insufficient to make the transfer to O'Hare an adverse employment action.

The Seventh Circuit has consistently held that lateral transfers that impose

inconveniences on an employee and alter the employee's job responsibilities are not adverse employment actions unless they involve a demotion, reduction in pay, material loss of job title and prestige or a dramatic reduction of job responsibilities. *See Spring v. Sheboygan Area Sch. Dist.*, 865 F.2d 883, 886 (7th Cir. 1989) (holding that principal's transfer to another school was not an adverse employment action absent a demotion or reduction in pay); *Crady*, 993 F.2d at 136 (holding employee's transfer to similar management position at same pay and benefits with similar job responsibilities was not adverse due to loss of title); *Williams v. Bristol-Myers Squibb Co.*, 85 F. 3d 270, 274 (7th Cir. 1996) (holding salesman's transfer to a new sales territory was a lateral transfer despite increased job responsibilities and reduction in commission pay). *But see Collins*, 830 F.2d at 704 (finding transfer was the equivalent of a demotion and an adverse action because plaintiff lost job title, office, telephone, business cards and listing in professional directories); *Dahm*, 60 F.3d at 257 (finding adverse action after severe reduction in employee's job responsibilities).

In the instant case, plaintiff admits that her transfer was to a lateral position in which she performed the same tasks. (Pl.'s LR 56.1 (b)(3)(A) ¶ 21.) Plaintiff does not allege that she received a reduction in pay or benefits, or that she suffered any other tangible loss. Plaintiff's only allegation is that she was unable to visit her doctor during her lunch break as a result of the transfer. However, plaintiff's lunchtime doctor visits were not a term, condition, or privilege of her employment. While plaintiff's doctor visits may have been a welcome convenience of her previous working location, mere inconveniences do not rise to the level of an adverse action, especially when the inconvenience does not effect a term or condition of employment.

Plaintiff has simply failed to present any genuine issue as to whether her transfer to the

O'Hare office was an adverse action. As a consequence, plaintiff has failed to establish a *prima facie* case of either retaliation or discrimination based on this conduct, and the Court grants summary judgment with regard to her claims based on this conduct.

### B. Delay in Expense Reimbursement

Plaintiff also alleges defendant's two-month delay in reimbursing her the $126.40 in traveling expenses she incurred during the last two weeks of her employment was an adverse employment action. (Def.'s LR 56.1(a)(3) ¶ 24.) Defendant attributes this delay to a dispute between the Downers Grove office and the O'Hare office as to which should reimburse plaintiff. (Def.'s LR 56.1(a)(3) ¶ 24.) Plaintiff was eventually paid for the expenses in April 1999, despite a company policy not to reimburse clerks for travel expenses. (Def.'s LR 56.1(a)(3) ¶¶ 25, 26.) Indeed, it appears that plaintiff was the only clerk who was reimbursed for her travel expenses from October 1998 to February 1999, even though other clerks were required to travel to other offices. (Def.'s LR 56.1(a)(3) ¶ 25.)

Defendant's delay in reimbursing plaintiff her traveling expenses was not an adverse action as to the terms, conditions or privileges of plaintiff's employment because under company policy, plaintiff was never entitled to such reimbursement. By receiving the reimbursement, although some months after her termination, plaintiff was actually given preferential treatment over other clerks in her same position.

In *Fyfe v. City of Fort Wayne*, the plaintiff argued that his former employer's refusal to reimburse his traveling expenses for an unauthorized trip was not an adverse action under Title VII. 241 F.3d 597, 602 (2001). The *Fyfe* court found that the employer's company policy made

11

reimbursements for traveling expenses discretionary. *Id.* As such, the court analogized the reimbursement to a bonus, which the employee has no expectation of receiving. *Id.* And because the plaintiff had no expectation in receiving the reimbursement, the defendant's refusal to reimburse the plaintiff's travel expenses was not an adverse employment action. *Id.* at 602-03.

Unlike the employer in *Fyfe* that reimbursed travel expenses on a discretionary basis, defendant in this case maintained a policy of *never* reimbursing its clerks for travel expenses. Thus, because Rawat had no reasonable basis to expect the reimbursement in the first instance, the fact that defendant delayed in issuing her the reimbursement cannot qualify as an adverse employment action. Accordingly, summary judgment is granted in favor of defendant as to Rawat's claims based on this conduct.

### C. 1998 Performance Evaluation Reduction

Plaintiff next alleges her reduced 1998 performance evaluation was an adverse employment action. However, "evaluations alone do not constitute an actionable adverse employment action." *Smart*, 89 F.3d at 442. Indeed, some tangible negative employment consequences, such as probation, demotion, a transfer and reduction in job responsibilities, or some direct monetary losses must accompany the evaluation. *See id.* (stating negative performance evaluations alone, without some tangible evidence of negative consequences, are not adverse employment actions).

It is clear from the record that O'Malley and Szekely based their decision not to absorb plaintiff into the Downers Grove office on plaintiff's 1998 evaluation. (*See* Def.'s Ex. M) (stating that "as a result of the [1998] evaluations," O'Malley recommended plaintiff be declared

excess).) Because plaintiff's reduced evaluation served as a basis for her termination, the evaluation is merely evidence to support her claims based on her termination and thus will be considered as such. However, the 1998 evaluation reduction and the facts surrounding the reduction, in and of themselves, cannot be the basis of her claim. To rule otherwise would deter any employer from communicating and documenting an employee's performance shortcomings due to a fear of a lawsuit. Accordingly, the Court grants defendants' motion for summary judgment as to Rawat's claim based on the evaluation reduction.

Plaintiff's remaining alleged adverse employment actions are her termination and defendant's failure to hire her. As defendant concedes, these actions undoubtedly are adverse employment actions under Title VII. However, defendant does not seek summary judgment as to plaintiff's claims based on her termination. Therefore, the Court will proceed to analyze plaintiff's retaliation and national origin discrimination claims based on defendant's failure to hire her.

## II. Retaliation

At the outset, the parties dispute the proper standard for establishing a *prima facie* claim of retaliation under Title VII and defendant disputes whether *Stone v. City of Indianapolis Public Utilities Division*, 281 F.3d 640, 644 (7th Cir. 2002), is binding authority, citing only unpublished Seventh Circuit opinions in support. On one hand, defendant argues that to state a *prima facie* case under Title VII, plaintiff must show that (1) she engaged in statutorily protected expression, (2) she suffered an adverse action by her employer, and (3) there is a causal link between her protected expression and the adverse action. *See Sweeney*, 149 F.3d at 555. On the

13

other hand, plaintiff argues that *Stone* lowered the threshold and announced a dual method for establishing a *prima facie* retaliation case under Title VII. First, Rawat argues that a plaintiff may establish a *prima facie* case by showing direct evidence that (1) she engaged in protected activity and (2) that she suffered an adverse employment action (3) as a result of her protected activity. 281 F.3d at 644. Second, a plaintiff may establish her case by showing (1) she engaged in statutorily protected expression, (2) after engaging in such expression she, and only she and not any similarly situated employee who did not engage in the protected expression, (3) was subject to an adverse employment action, (4) despite the fact that she was performing her job in a satisfactory manner. *Id.* In any event, it is unnecessary for the Court to resolve *Stone*'s effect on the law because under either standard, summary judgment must be granted in favor of Metropolitan Life Insurance Co.


### A. Direct Evidence Method

Using the direct evidence method, the plaintiff must present "direct evidence (*evidence that establishes without resort to inferences from circumstantial evidence*) that [she] engaged in protected activity ... and as a result suffered the adverse employment action of which [she] complains." *Stone*, 281 F.3d at 644. The first *Stone* methodology is similar to that which defendant seeks to apply, and the Court will treat it as such. *Compare id., with Sweeney*, 149 F.3d at 555.

The parties do not appear to dispute that plaintiff engaged in protected activity or that she suffered an adverse employment action. The question is: Is there is sufficient evidence in the record to create a triable issue as to whether plaintiff was fired *as a result* of her protected

activity? The record simply does not contain sufficient evidence such that a reasonable jury could find in favor of plaintiff. Further, the record is devoid of the smoking gun needed under *Stone*'s direct evidence method to establish a *prima facie* case.

Direct evidence is evidence that "if believed by the trier of fact, will prove the particular fact in question without reliance upon inference or presumption." *Kennedy v. Schoenberg, Fisher & Newman, Ltd.*, 140 F.3d 716, 723 (7th Cir. 1998). Direct evidence usually "takes the form" of a statement by the defendant acknowledging that the plaintiff was fired because she engaged in protected activity. *Id.*; *see also Gorence v. Eagle Food Ctrs., Inc.*, 242 F.3d 759, 762 (7th Cir. 2001) (stating direct evidence of age discrimination would be a statement by an employer that the employer "fired Judy because she was an old woman."). Plaintiff fails to produce any evidence of this sort.

Plaintiff opines that defendant decided as early as October 1997 to close the Elmhurst location, some five months after she signed the affidavit in connection with Linda Einspar's sexual harassment complaint. Plaintiff's theory is that at this time defendant hatched a plan to reduce her performance evaluation for 1998 in retaliation for her participation in the *Einspar* case, anticipating that when the Elmhurst office was merged into the Downers Grove office, there would be an excess of QBC clerks and that some clerks would have to be let go and defendant would be able to justify terminating plaintiff as a result of her poor performance evaluation.

However, plaintiff does not present any direct evidence of such a scheme, but instead relies exclusively on the timing of her performance evaluations to support her theory. Plaintiff's evidence requires precisely the kind of "inferences and presumptions" that *Stone* prohibits under the direct evidence method. *See Fyfe*, 241 F.3d at 601. As for her retaliation claim based on

defendant's failure to hire, plaintiff fails to even assert a theory, let alone produce any direct evidence showing defendant failed to hire her at the O'Hare office as a result of her protected expression.

*Stone* provides, however, that in some instances temporal proximity between the protected activity and the adverse action may defeat summary judgment. 281 F.3d at 644. However, *Stone* warns that "mere temporal proximity between the [protected activity] and the action alleged to have been taken in retaliation for that [activity] will rarely be sufficient in and of itself to create a triable issue." *Id.* This language coupled with prior case law suggests the proximity between the protected expression and the retaliation must be "very close" in time. *See Hughes v. Derwinski*, 967 F.2d 1168, 1174-75 (7th Cir. 1992) (holding four months too long); *Juarez v. Ameritech Mobile Communications, Inc.*, 957 F.2d 317, 321 (7th Cir. 1992) (holding six months too long). *But see Johnson v. Sullivan*, 945 F.2d 976, 980 (7th Cir. 1991) (holding one day separating the protected activity and the adverse employment action sufficient to establish causation).

Plaintiff lodged her internal complaint about Goel on August 23, 1995, over three and a half years before defendant's decision to terminate her and not hire her at the O'Hare office. Defendant terminated plaintiff on February 12, 1999 and decided not to hire plaintiff at the O'Hare office sometime between February 12 and February 19, 1999. Clearly this gap in time is too large to create a triable issue with regard to retaliation.

Plaintiff signed the affidavit in the *Einspar* case on May 29, 1997, over a year and half before defendant terminated her and decided not to hire her at O'Hare. This also is far too attenuated a temporal sequence to support an inference of retaliation. Plaintiff argues the Court

16

should focus on the date that defendant settled the case with Einspar - February 28, 1998. The Court disagrees. It is clear that the protected activity occurred when plaintiff submitted her revised affidavit that reflected negatively on Goel in the *Einspar* case. However, even if the Court were to find that plaintiff's protected activity occurred upon the settlement of *Einspar*, which it does not, the adverse actions did not occur until nearly a year later. The substantial gaps of time between these events and the adverse actions simply cannot support a reasonable inference that her termination or the failure to hire her was the result of defendant's retaliatory intent.

Plaintiff argues that there were less than stellar performance evaluations between her protected activities and the adverse employment actions. First, the record does not show that defendant relied on Rawat's 1997 performance evaluation of "generally effective" when it decided to discharge her or not hire her at the O'Hare office. Even if plaintiff could show that defendant relied on her 1997 performance evaluation, such evaluation did not occur until March 1998, ten months after she signed her affidavit in the *Einspar* case and two years and seven months after her internal complaint regarding Goel. Further, the fact that defendant assessed her performance as "very effective" after her internal complaint about Goel in 1995 belies her theory of a causal relation between her internal complaint and the adverse employment actions. Second, her evaluations of her performance in 1998 occurred approximately two and a half years after her participation in the *Einspar* case and four and a half years after her internal complaint about Goel. The time sequence, even when the Court considers Rawat's performance reviews, is too attenuated to create a triable issue.

Therefore, the Court finds that under either the method forwarded by defendant or the

first prong of the Stone methodology urged by plaintiff, the result is the same. Plaintiff is unable to establish a genuine issue as to a material fact.

### B. McDonnell Douglas Method

Under the second prong of *Stone*, plaintiff may establish a *prima facie* case using a test derived from *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), initially reserved for discrimination cases. *Stone*, 281 F.3d at 644. Under this test, plaintiff must show: (1) that she engaged in protected activity, (2) after which, only she, and no other similarly situated employees who did not engage in protected activity, (3) was fired, (4) even though she was performing her job in a satisfactory manner. *Id.*

Plaintiff fails to establish a prima facie case of retaliation under *McDonnell Douglas* because another similarly situated employee, who did not engage in any protected activity, was treated in the exact same manner as plaintiff. Plaintiff was one of eleven clerks from both the Elmhurst and Downers Grove offices that management evaluated at the time of the merger. Of these eleven, management recommended, and ultimately did, terminate four of these clerks, including plaintiff.

Among the four terminated clerks besides plaintiff was Denise Kasper, another clerk from the Elmhurst office. Just like plaintiff, Kasper's 1998 evaluation was reduced from a 3 to a 2. And just like plaintiff, Kasper was terminated by management, which relied on the reduced evaluation. Furthermore, Kasper was never hired at O'Hare or any other office. But unlike plaintiff, Kasper never engaged in any protected activities.

Because there was another employee in the same position as plaintiff and that employee

was treated in the exact same manner, but did not engage in protected activity, plaintiff is unable to establish a *prima facie* case of retaliatory discharge or failure to hire under the second *Stone* method. In sum, plaintiff is unable to establish a triable issue with regard to her retaliation claims using either of the methodologies proposed. As a result, defendant is entitled to summary judgment on plaintiff's retaliation claims.

### III. Discrimination

Plaintiff claims defendant unlawfully discharged her based on her national origin, as well as failed to hire her as a full-time employee at the O'Hare office based on her national origin. Defendant only seeks summary judgment as to plaintiff's discrimination claim based on defendant's failure to hire her. To establish a *prima facie* case of discrimination under Title VII, a plaintiff must show that she (1) is a member of a protected class; (2) she applied for and was qualified for an open position; (3) she was rejected; and (4) defendant filled the position with a person not in the plaintiff's protected class. *Bennett v. Roberts*, 295 F.3d 687, 694 (7th Cir. 2002).

Plaintiff has established the first and third elements of the *prima facie* case. It is undisputed that plaintiff is a member of a protected class and there is no dispute that she was not hired at the O'Hare office.

Even if the Court were to assume that plaintiff could establish the second element of the prima facie case, *i.e.*, that she applied for and was qualified for an open position, plaintiff clearly has failed to create a genuine issue as to a material fact regarding the fourth element. It is undisputed that in late 1998, Raja Banerji was the branch manager at O'Hare and he was

19

interested in permanently transferring plaintiff to O'Hare. (Def.'s LR56.1(a)(3) ¶ 8.) In early

1999, however, Banerji was demoted and Subhash Katial became branch manager. (*Id.*) It is

undisputed that Katial decided not to hire anyone until he could fully assess the office's clerical

needs. (*Id.* ¶ 12.) Katial did not hire any full-time clerks at O'Hare, and instead, he eventually

hired one part-time clerk, Anita Surti. (*Id.* ¶ 13.) Surti is a native of India just like plaintiff.

Because plaintiff has failed to establish that defendant filled the position with a person not in

plaintiff's protected class, plaintiff cannot make out a *prima facie* case for national origin

discrimination under Title VII. Accordingly, summary judgment for defendant is proper.


## IV. State Law Claims

Plaintiff also alleges two causes of action based on Illinois law: intentional infliction of

emotional distress and breach of contract. The Court addresses each in turn.


### A. Intentional Infliction of Emotional Distress

Defendant has moved for summary judgment as to plaintiff's intentional infliction of

emotional distress ("IIED") claim. Under Illinois law, the elements of a cause of action for

intentional infliction of emotional distress are as follows:

> First, the conduct involved must be truly extreme and outrageous. Second, the
> actor must either intend that his conduct inflict severe emotional distress, or know
> that there is at least a high probability that this conduct will cause severe
> emotional distress. Third, the conduct must in fact cause severe emotional
> distress.

*McGrath v. Fahey*, 533 N.E.2d 806, 809 (Ill. 1988). To be extreme and outrageous, defendant's

conduct must go beyond "mere insults, indignities, threats, annoyances, petty oppressions or

trivialities." *Public Fin. Corp. v. Davis*, 360 N.E.2d 765, 767 (Ill. 1976). "Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency." *Id.*

In support of her claim, Rawat relies on events that occurred prior to April 24, 1998, two years prior to the date on which she filed her complaint in the instant case. To the extent that her IIED claim is based on these events, her claim is clearly time-barred by the two-year statute of limitations for torts in Illinois. *See Dahl v. Fed'l Land Bank Ass'n*, 572 N.E.2d 311, 313 (Ill. App. Ct. 1991). Further, based on the nature of these events, the doctrines of equitable tolling or estoppel could not save her IIED claim based on this conduct.

However, that is not the only conduct upon which plaintiff bases her IIED claim. Plaintiff also grounds her IIED claim on defendant's: (1) transferring her to the O'Hare branch thirty miles from her home knowing that doing so would prevent her from keeping appointments for physical therapy; (2) requiring her to provide clerical support to two offices located twenty miles apart; (3) discriminating against her by firing her and not rehiring her; and (4) refusing to reimburse her for two expense reports in a timely manner.

When a plaintiff is suing her employer for intentional infliction of emotional distress, the showing of extreme and outrageous behavior is more stringently applied. *Figueroa v. City of Chicago*, No. 97 C 8861, 2000 WL 283080, at *11 (N.D. Ill. Mar. 3, 2000). "Courts are concerned that, if everyday job stresses resulting from discipline, personality conflicts, job transfers or even terminations could give rise to a cause of action for intentional infliction of emotional distress, nearly every employee would have a cause of action." *Graham v. Commonwealth Edison Co.*, 742 N.E.2d 858, 867 (Ill. App. Ct. 2000). Further, "it is clearly

21

established that wrongful discharge, alone, even where such a discharge is malicious, does not constitute grounds for a claim of intentional infliction of emotional distress against an employer." *Fang v. Vill. of Roselle*, No. 95 C 5175, 1996 WL 386556, at \*3 (N.D. Ill. July 5, 1996).

Accordingly, viewing the entire record in the light most favorable to Rawat, defendant's conduct does not rise to the level of extreme and outrageous conduct. The record does not show that defendant abused the power it held over Rawat in a manner far more severe than the typical job-related stress caused by the work environment. This is true even if Rawat were to be successful at trial on her discrimination claim based on her termination.

Plaintiff apparently realizes the overall merit of her IIED claim because in her response brief, she states, "Plaintiff offers no response to the IIED claim." (Pl.'s Resp. MetLife's Partial Summ. J. Re: Tort & Contract Claims, at 8.) This cryptic response is clearly insufficient and connotes a waiver of the claim and arguments in support of the claim. Even if plaintiff did not intend to waive this claim, there is no triable issue of fact because defendant's conduct was not extreme and outrageous. Accordingly, the Court grants defendant's motion for summary judgment as to this claim.

### B. Breach of Contract

Plaintiff next asserts that defendant's employee handbook constitutes an employment contract, that her managers violated several handbook provisions before terminating her, and that as a result, MetLife breached the employment contract. Defendant has moved for summary judgment as to this claim arguing that the undisputed facts show that there was no employment contract between it and plaintiff.

An employment relationship without a fixed term or duration is presumed to be at will employment, terminable by either party at any time, for any reason. *Duldulao v. St. Mary of Nazareth Hosp. Ctr.*, 505 N.E.2d 314, 317 (Ill. 1987). This presumption may be rebutted by evidence that the parties contracted otherwise. *Id.* at 318. In Illinois, an employee handbook may form an employment contract that rebuts the at-will employment presumption when: (1) the handbook contains a clear promise that an employee could reasonably believe was an offer, (2) the handbook containing the promise is given to the employee so that the employee is aware of the promise and believes it to be an offer, and (3) the employee accepts the offer by continuing to work after learning of the promise. *Id.* However, when an employee handbook unambiguously disclaims any contractual relationship, an employee cannot reasonably believe that an offer has been made, and there is no employment contract. *Doe v. First Nat'l Bank of Chicago*, 865 F.2d 864, 873 (7th Cir. 1989); *see also Boulay v. Impell Corp.*, 939 F.2d 480, 483 (7th Cir. 1991) (holding that disclaimer "negates an employee's contractual expectations"); *Zakaras v. United Airlines, Inc.*, 121 F. Supp 2d 1196, 1214 (N.D. Ill. 2000) (noting that summary judgment is appropriate when handbook contains a disclaimer); *Hanna v. Marshall Field & Co.*, 665 N.E.2d 343, 348 (Ill. App. Ct. 1996) (holding that "[d]isclaimers in an employee handbook . . . negate contract formation under *Duldulao*").

There is some dispute between the parties over which version of defendant's employee handbook is relevant to this case. Plaintiff argues that defendant's 1990 handbook governs this case, while defendant argues its 1997 handbook governs. It is unnecessary to resolve this dispute, however, because the result is the same regardless of which handbook governs.

The first page of defendant's 1990 handbook expressly states: "The policies, practices

23

and benefits described in this handbook do not constitute, nor do they represent, a contract or guarantee of employment. Furthermore, they are subject to change by the Company at any time with or without notice." (Pl.'s Ex. A.) The first page of defendant's 1997 handbook expressly states that "All employment with MetLife is 'at-will.' Nothing is this handbook limits Metropolitan Life Insurance Company's absolute right to change its policies and practices concerning your employment or to terminate your employment with or without cause, for any reason or no reason, and with or without prior notice at any time." (Pl.'s Ex. B.)

This clear and unambiguous language belies plaintiff's claim that she reasonably believed defendant's handbook constituted an offer for term employment. As a result, the handbook cannot be the source of any contractual obligation by defendant. Consequently, the Court grants defendant's motion for summary judgment as to plaintiff's breach of contract claim.

## CONCLUSION

For the reasons provided in this Memorandum Opinion and Order, the Court grants defendant's motion for partial summary judgment [doc. nos. 42-1 and 43-1]. Only Rawat's national origin discrimination claim based on her termination remains for trial.

**SO ORDERED**                    **ENTERED:** 3/28/03

HON. RONALD A. GUZMAN
**United States Judge**

24